## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DELMAR JEROME SUTTLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-532-PJC** |
| | ) | |
| **CAROLYN W. COLVIN, Acting Commissioner** | ) | |
| of the Social Security Administration,[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Delmar Jerome Suttles ("Suttles"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Suttles appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision

### Claimant's Background

At the time of the hearing before the ALJ on May 24, 2010, Suttles was 56 years old. (R. 29).  He had an associate's degree, had previously owned a car wash, and had worked in

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

customer service.  (R. 29, 37, 44).  Suttles claimed an inability to work due to his diabetes, history of stroke, an arthritic knee, difficulty walking, and depression.  (R. 29, 32, 34, 39).

Suttles testified that after being hospitalized for a stroke, he could not walk long distances due to pain and swelling in his knee and due to leg weakness.  (R. 31-32, 39-40).  According to Suttles, he had one leg that gave out approximately once a month.  (R. 32).   Suttles walked with a cane for stability, and testified that he could walk one block to a block-and-a-half before needing to rest.  (R. 33, 37).  He could not stand for long periods of time, even with support from his cane.  (R. 38).  He described his knee as arthritic and said that it caused him pain every day, which was exacerbated by cold and rain.  (R. 39-41).  Suttles also testified he had several operations on his feet as a child to correct claw/clubbed feet, which left his feet with lingering numbness and pain in his feet. (R. 40-41).

Suttles opined that he could not sit for an hour without needing to stand up and stretch, and that he could not sit more than a total of two hours in an eight-hour day without needing to lie down. (R. 37-39).  He testified that when he previously worked in customer service, he would get back spasms and would have to stand up.  (R. 37).

Suttles had previously suffered from a paralyzed nerve in one eye, which was subsequently repaired, and had been treated for tuberculosis.  (R. 33-34).  He was also being treated for depression and trouble concentrating.  (R. 34).  Suttles testified that some of his medication caused side effects, including blurry vision, headaches, and an inability to concentrate. (R. 33-34, 37, 43).

Suttles testified that he lived alone and was able to take care of most household chores, such as cooking and vacuuming. (R. 30, 39, 42).  However, he also stated that he had to sit or lie

down intermittently while doing such tasks, and that household chores got done "very slowly."
*Id.* Suttles did not own a car, but was able to ride the bus to doctor appointments. (R. 35).

On June 29, 2008, Suttles presented to the emergency department of Saint Francis
Hospital ("Saint Francis") with complaints of intermittent respiratory problems. (R. 257-67).
Suttles thought he had possibly been exposed to mold or mildew because his apartment had
repeatedly flooded with raw sewage and the carpet had not been removed. (R. 259). A chest x-
ray did not show any abnormalities. (R. 258-59). Suttles was assessed with tobacco abuse with
chronic bronchitis and with possible mildew/mold exposure. (R. 259). He was prescribed
Doxycycline,[2] instructed to stop smoking, and to move to another apartment unit if possible. *Id*.

On January 31, 2009, Suttles presented to Saint Francis, complaining of double vision
and an inability to control his right eye. (R. 240-56). A head CT scan revealed "a tiny old
lacunar infarct[3] in the left caudate nucleus toward the head . . . [and a] tiny old lacunar infarct in
the right lentiform nucleus." (R. 244). Dr. Vicky L. Weidner's impression was abducens nerve
palsy,[4] new onset diabetes, and right leg weakness "perhaps secondary to a small cerebrovascular
accident."[5] (R. 246). Dr. Weidner further explained that the "new-onset diabetes. . . could have

---

[2] Doxycycline is an antibiotic used to treat bacterial infections. *www.pdr.net*.

[3] A lacunar infarct (coagulation) occurs in certain parts of the brain, most often in older
patients with hypertension or diabetes, and may be asymptomatic or cause significant
impairment. *Dorland's Illustrated Medical Dictionary* 894, 956 (29th ed. 2000) (hereinafter
"*Dorland's*").

[4] Abducens nerve palsy is the paralysis of the sixth cranial nerve. *Dorland's* at 1196,
1199, 1307.

[5] A cerebrovascular accident, also commonly referred to as CVA, is a medical term for a
stroke. *See Dorland's* at 439.

caused a stroke in the nerve that supplies the muscles of his eye and maybe even a stroke in his brain that is controlling his eye." (R. 248). Despite explaining to Suttles the urgency of further evaluation and treatment, he refused to be admitted to the hospital until he could return the following day. *Id*.

Suttles returned to Saint Francis on February 1, 2009 for admission. (R. 217-39). His primary complaint was still double vision, but he also complained of chronic right leg weakness and a burning headache. (R. 226). Medical records noted Suttles' previous foot surgeries and indicated that he drank "half a pint to three-fourths a pint of liquor plus beer every day." (R. 218). He was admitted with diagnoses of cranial nerve palsy, secondary to diabetes and hypertension, hyperlipidemia, and right leg weakness. (R. 220). During his hospital stay, an MRI of the brain revealed no "acute intercranial process, but there was generalized volume loss." (R. 217). Suttles also had a head CT scan, which showed "minimal old ischemic change," but no "acute process." *Id.* Suttles' double vision resolved once his blood sugar was brought under control. *Id.* Suttles was discharged on February 4, 2009, with recommendations to cease smoking, follow a diabetic diet, take his prescribed medications,[6] and to follow-up with the University of Oklahoma medical clinic the following day. (R. 217, 273).

On February 10, 2009, Suttles sought treatment for right knee pain at Saint Francis. (R. 203-15). Suttles reported that the pain had acutely worsened on that day, and medical records reflect differing accounts of how long Suttles had been experiencing chronic knee pain, whether it was for only10 days or for 2-3 months. (R. 206, 210-11). He described the pain as aching, and

---

[6] Suttles was prescribed medication to treat hypertension (aspirin and lisinopril) and diabetes (metformin and simvastatin). (R. 217). *www.pdr.net*.

rated its severity as 9 out of 10.  (R. 210-11).  An x-ray of his right knee showed "deformity of the proximal fibular shaft that may represent a minimally displaced fracture."  (R. 204).  Upon examination, Suttles had tenderness to palpation over the patella and patellar tendon, but otherwise had a good range of motion of his knee in both passive and active movement, unaccompanied by pain, and without laxity.  (R. 205-06).  Suttles was assessed with osteoarthritis of the right knee with joint space narrowing.  (R. 206).  He was instructed to take ibuprofen for pain and to follow up with his primary care provider.  *Id.*

On February 27, 2009, Suttles was seen by Mary Batiste, A.R.N.P., at Morton Comprehensive Health Services ("Morton") with complaints of cough and congestion, and requesting refills of his medications.  (R. 290-91).  Batiste's impression was acute bronchitis, diabetes mellitus, and hypertension.  *Id.*  Suttles returned for a follow-up visit on March 9, 2009 and reported no new problems. (R. 290).  A monofilament wire test showed decreased sensation in both of his feet.  *Id.*

Suttles presented to the OU Physicians Family Medicine Clinic ("OU Clinic") on March 10, 2009 for diabetes management.  (R. 270-72).  Suttles reported a blood sugar level of 177, as well as excessive thirst and urination. (R. 270).  It was noted that Suttles had a history of a right-sided cardiovascular accident with right-sided weakness, and blurry vision related to his stroke.  *Id.*  It was noted that the right-sided weakness was "mild."  (R. 272).  Also on that date, Suttles met with Amie Koehn, M.S.W., at the OU Clinic.  (R. 268-69).  She indicated that Suttles had a dull affect and sad mood.  (R. 269).  Suttles reported that his diabetes diagnosis had been upsetting him.  *Id.*  Koehn provided resource information for stress management, food, dental, and pharmacy assistance.  *Id.*

5

On May 12, 2009, Suttles returned to the OU Clinic.  (R. 352-54).  Suttles described blurry vision in his right eye, right-sided weakness, tingling in his upper extremities, polyuria,[7] and anxiety from dealing with his diabetes.  (R. 353).  It was noted that his sugars were not monitored properly.  *Id*.  Suttles reported that he had recently fallen three times due to his right-sided weakness and requested a cane.  *Id.*  Physical examination revealed decreased strength in his right arm, and weakness in his right arm and leg. ( R. 354).

Suttles returned to Morton on May 27, 2009 for a follow-up appointment and indicated that he had been out of his medication for three days.  (R. 294).  Suttles also complained of right knee pain and weakness. (R. 294).  He reported that his knee often gave out and had once caused him to fall.  *Id.*

On June 9, 2009, Suttles presented to the OU Clinic for a follow-up appointment and expressed that his main concern was anxiety regarding his diabetes management.  (R. 347-49).  Suttles indicated he just needed to become accustomed to watching his diet and taking medication.  (R. 348). Suttles also complained of nighttime urination and indicated he had purchased a cane to assist with walking.  *Id*.  Suttles was instructed to schedule a follow-up appointment in two weeks.  (R. 349).

Suttles did not return to the OU Clinic until August 11, 2009.  (R. 342-46).   He continued to complain of being "stressed" about his diabetes and medication.  (R. 344).  He reported weather changes caused a "shooting sharp pain" in his right leg and that he had been falling every 1-2 months when his right leg would give out.  *Id.*  Suttles also described blurry

---

[7]  Polyuria is the passage of a large amount of urine, characteristic of diabetes.  *Dorland's* at 1436.

vision after looking at a computer, nighttime urination, and difficulty falling back asleep.  *Id*.

Additional complaints included back pain, muscle weakness, arthritis, and loss of strength. (R.

345).  Suttles was referred to a counselor for his anxiety, his prescriptions were refilled, and it

was noted that he was using a cane to prevent falls.  (R. 346).

On August 28, 2009 Suttles met with Elka Serrano, M.D., for a psychiatric diagnostic

evaluation.  (R. 394-95).  He reported needing treatment for stress, anxiety, and depression due to

his inability to work.  (R. 394).  In describing his symptoms, Suttles reported low energy, poor

concentration, difficulty sleeping, fluctuating appetite, panic attacks, worry, and hearing his

deceased father talking to him.  *Id*.  Dr. Serrano noted that Suttles was alert, oriented, had linear

thought processes, a sad mood, and congruent affect. (R. 394-95).  Suttles was diagnosed by Dr.

Serrano on Axis I[8] with major depressive disorder, recurrent, moderate; panic disorder without

agoraphobia; and psychosis, not otherwise specified.  (R. 395).  Suttles' Global Assessment of

Functioning ("GAF")[9] score was listed as 55/60.  *Id*.  Suttles was prescribed Celexa for his

depression/anxiety, Abilify for the auditory hallucinations, and Vistaril to help with

anxiety/sleep.  *Id*.

Suttles presented to the OU Clinic on September 22, 2009 to refill his medications and

---

[8] The multiaxial system "facilitates comprehensive and systematic evaluation."  Am.
Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 27 (Text Rev. 4th ed. 2000)
(hereinafter "DSM IV").

[9] The GAF score represents Axis V of the multiaxial system.  *See* DSM IV at 32-34.  A
GAF score is a subjective determination which represents the "clinician's judgment of the
individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100.  A GAF score
of 51-60 reflects "moderate symptoms . . . or moderate difficulty in social, occupational, or
school functioning."  *Id.* at 34.

reported that he had not been taking his blood sugar readings at home. (R. 338-41).  Suttles also

reported that he had stopped taking the medication prescribed by Dr. Serrano because it had

given him diarrhea.  (R. 340-41).   He complained of throbbing pain in his right leg that flared up

twice a week and sometimes woke him at night.  (R. 338).  Medical records indicate that because

Suttles did not experience weakness and pain in both legs, it was opined that the symptoms were

more characteristic of stroke sequela.  (R. 341).

On October 20, 2009, Suttles had a diabetes follow-up appointment at the OU Clinic.  (R.

334-37).  Suttles reported that his blood sugar level had been fluctuating for the last week and he

complained of blurring and vision loss in both eyes.  (R. 335).  He continued to report

intermittent falls, though they had not increased in frequency.  *Id*.  Suttles' eye examination and

glucose level were within normal limits. (R. 335-36).  Suttles had a painful abrasion on his right

foot, and he was prescribed naproxen for pain and referred to a podiatrist.  (R. 334, 336-37).

Suttles followed up with Dr. Serrano on November 6, 2009.  (R. 391).  Despite his

previous report to the OU Clinic that he had stopped taking his psychiatric medication, Suttles

reported compliance with his medications, but complained of headaches from the Celexa.  *Id*.  He

continued to report low energy, poor concentration, difficulty sleeping, decreased interests, and

depressed mood.  *Id.*  Suttles did report occasional thinking about running out into the street but

stated he would not act on the thoughts.  *Id*.  He also admitted to still hearing his father's voice

on occasion.  *Id*.  Suttles indicated he drank half a pint of alcohol every 2-3 days.  *Id*.  Dr.

Serrano recommended Suttles quit drinking alcohol, increased the dosage of Abilify and Celexa,

and prescribed Trazodone to help with sleep.  *Id*.

On November 10, 2009, Suttles visited the OU Clinic to discuss getting disability

benefits. (R. 328-30).  Suttles reported being diagnosed with bipolar disorder and reported

hearing voices, racing thoughts, and times of not needing sleep.  (R. 329-30).   However, Suttles

reported that medication was controlling these symptoms and the Celexa had "been working

well" for his depression.  (R. 330).

Suttles next presented to the OU Clinic on January 26, 2010 to refill his prescriptions and

check his blood sugar level.  (R. 323-27).  He complained of right foot numbness, shooting pains

in his right leg, joint pain, and depression.  (R. 323-24).  In addition to refilling his medications,

Suttles was prescribed Neurontin for his neuropathic symptoms.  (R. 324-26).

On March 5, 2010, Suttles presented to Robert Guevara, M.D., for a follow-up

examination, after his care was transferred from the OU Clinic.  (R. 384-88).  Dr. Guevara noted

weakness and decreased reflexes in Suttles' lower extremities, though his gait was normal.  (R.

386).  He encouraged Suttles to quit smoking, to exercise, lose weight, and continue taking

medications as prescribed. (R. 387-88).

Suttles had a follow-up visit with Dr. Serrano on March 23, 2010, and continued to

complain of a depressed mood due to his diabetes diagnosis.  (R. 373).  Suttles also reported that

he still heard his father's voice and that he saw mice, but it had been "going on so long he [was]

used to them." *Id.*  Suttles reported low energy, increased appetite, and difficulty sleeping, though

he was able to nap during the day.  *Id.*  Dr. Serrano increased the dosage of Abilify to help with

Suttles' auditory and visual hallucinations, and switched from Celexa to Effexor for his

depression and anxiety.  *Id.*

On May 14, 2010, Suttles had a follow-up appointment with Dr. Guevara.   (380-83).

Suttles had gained some weight since his last appointment and admitted that his diet had not been

9

good and that he was not exercising.  (R. 380).  On this visit, Suttles reported occasional right leg

weakness and problems with his memory since his reported stroke, but denied troubling thoughts

or depression.  (R. 381-82).

Non-examining agency consultant Janet G. Rodgers, M.D., completed a Physical

Residual Functional Capacity Assessment on April 21, 2009. (R. 280-87).  Dr. Rodgers

determined that Suttles could occasionally lift and carry 20 pounds, and frequently lift and carry

10 pounds; that he could stand and walk for about 6 hours in an 8-hour work day; that he could

sit for a total of 6 hours in an 8-hour work day; and that he had no restrictions on pushing and

pulling.  (R. 281).  Dr. Rodgers also determined that there were no postural, manipulative, visual,

communicative, or environmental limitations established. (R. 282-84).  In support of these

opinions, Dr. Rodgers commented that Suttles:

> has had a cranial nerve VI palsy secondary to diabetes and hypertension with small
> lacunar infarctions and weakness in the right leg.  Symptoms have by large resolved.
> Physical exam by physician cannot detect right leg weakness as described by the
> claimant. Double vision (when turning eyes to the right) has apparently resolved with
> no vision changes. He has full range of motion of his motor movements except he is
> unable to adduct his right eye.

(R. 281).

Non-examining agency consultant Tom Shadid, Ph.D., completed only the "Consultant's

Notes" section of a Psychiatric Review Technique ("PRT") form on June 6, 2009.  (R. 295-308).

Dr. Shadid noted that the medical evidence did not indicate Suttles had received treatment for

any mental condition and that he was cable of completing his activities of daily living, including

cooking, cleaning, handling money, going shopping, and social interaction.  (R. 307).  Dr. Shadid

also noted that On February 1, 2009, Suttles had denied thoughts of suicide, depression, or

anxiety.  *Id.*

Agency consultant Ashley Nicole Gourd, M.D., conducted an examination of Suttles on September 11, 2009.  (R. 310-14, 377-78).  Dr. Gourd described Suttles' chief complaints as multiple strokes, resulting in right leg weakness and decreased vision in his right eye, and diabetes.  (R. 310, 377).  Suttles reported that he was able to complete all activities of daily living.  *Id.*  Upon examination, Suttles moved all extremities well, had a full range of motion and did not experience any pain during testing.  (R. 311-14, 378).  Straight leg raises were negative in the seated and supine positions and toe and heel walking was normal bilaterally.  (R. 378).  Suttles ambulated with a stable gait at an appropriate speed, and without the use of assistive devices.  *Id*.  Peripheral pulses were adequate, cranial nerves were grossly intact, there were no focal or sensory deficits appreciated, and there were no significant residual deficits resulting from a stroke during the examination.  *Id*.  Dr. Gourd indicated that Suttles had normal grip strength, could pick up and manipulate paperclips without difficulty, could effectively oppose his thumbs to his fingertips, manipulate small objects, and effectively grasp tools. (R. 313, 378).

Non-examining agency consultant Dr. Thurma Fiegel, M.D., completed a Physical Residual Functional Capacity Assessment on September 16, 2009.  (R. 315-22, 361).  Dr. Fiegel determined that Suttles could occasionally lift and carry 50 pounds and could frequently lift and carry 25 pounds; that he could stand and walk for 6 hours out of an 8-hour workday and sit for 6 hours out of an 8-hour workday.  (R. 316).  Dr. Fiegel found no restrictions on pushing and pulling, and that Suttles had no postural, manipulative, visual, communicative, or environmental limitations. (R. 317-19).  Dr. Fiegel noted that Suttles did not have a "persistent neurological deficit" and that he now had normal vision, normal gait, and use of his hands.  (R. 316).

11

**Procedural History**

On March 12, 2009, Suttles filed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits, under the Social Security Act, 42 U.S.C §§ 401 *et seq.* (R. 112-21). Suttles alleged the onset of his disability began October 26, 2008. (R. 112, 115). Suttles' applications for benefits were denied initially and upon reconsideration. (R. 49-52). A hearing before ALJ Lantz McClain was held on May 24, 2010 in Tulsa, Oklahoma. (R. 25-48). By decision dated July 30, 2010 the ALJ found that Suttles was not disabled. (R. 14-22). On July 22, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[10]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[10] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ determined that Suttles met insured status through December 31, 2009.  (R. 16).

--------

(Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

At Step One, the ALJ found that Suttles had not engaged in substantial gainful activity since

October 26, 2008, the alleged onset date of his disability.  *Id.*  At Step Two, the ALJ found that

Suttles had severe impairments of right knee pain, diabetes mellitus, hypertension, and a history

of lacunar stroke.  *Id.*  At Step Three, the ALJ found that Suttles' impairments, or combination of

impairments, did not meet the requirements of a Listing.  (R. 18).

After reviewing the record, the ALJ determined Suttles had the RFC to perform a full

range of sedentary work.  (R. 18, 21).  At Step Four, the ALJ found that Suttles was capable of

performing past relevant work as a customer service representative.  (R. 22).  Therefore, the ALJ

found that Suttles was not disabled from October 26, 2008 through the date of his decision.  (R.

22).

**Review**

Suttles raises issues regarding the ALJ's Step Four determination and his credibility

assessment.  Regarding the issues raised by Suttles, the undersigned finds that the ALJ's decision

is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's

decision is affirmed.

**Step Four Issues**

Regarding asserted errors at Step Four, Suttles' first argument was that the ALJ should

have included his nonsevere mental impairments in his hypothetical to the vocational expert

("VE").  Plaintiff's Opening Brief, Dkt. #16, p. 2.  In this case, however, the ALJ made specific

findings that Suttles' mental impairments were nonsevere and would "not cause more than

minimal limitation in [his] ability to perform basic mental work activities."  (R. 17).  These

findings by the ALJ made it clear that he found no limitations related to Suttles' nonsevere

14

mental impairments that needed to be included.  *See e.g., Qualls v. Astrue*, 428 Fed. Appx. 841,

850-51 (10th Cir. 2011) (unpublished) (rejecting claimant's argument that the ALJ had omitted

limitations in the RFC determination that resulted from nonsevere mental impairments); *Dray v.

Astrue*, 353 Fed. Appx. 147, 150-51 (10th Cir. 2009) (unpublished) (evidence of mild mental

impairments did not contradict ALJ's RFC determination omitting any limitations related to

mental impairments).  Where substantial evidence supports an ALJ's finding that there are no

work-related limitations related to a nonsevere mental impairment, "the ALJ is not required to

include that impairment in his hypothetical." *Bias v. Astrue*, 484 Fed. Appx. 275, 276 (10 Cir.

2012) (unpublished) (*citing Qualls*, 428 Fed.Appx. at 851).

Suttles also claimed error in the ALJ's failure to inquire into the mental demands of his

past relevant work, citing *Winfrey v. Chater*, 92 F.3d 1017, 1025-26 (10th Cir. 1995).  The facts

of *Winfrey*, however, appear to be distinguishable from Suttles' situation, in that the ALJ in

*Winfrey* found the claimant had "nonexertional mental impairments" which *did* affect his ability

to work.  *Id.* at 1020; *see also id.* at 1024 (referring to the PRT completed by the ALJ).  Under

those circumstances, the Tenth Circuit said that the ALJ's failure to inquire regarding the mental

demands of the claimant's past relevant work was erroneous.  *Id.* at 866.

Here, however, the ALJ made affirmative findings that Suttles' mental impairments were

nonsevere and would *not* interfere with his ability to work.  (R. 17).  Therefore, the ALJ did not

include any mental functional limitations in his RFC determination.  (R. 18).  Under the facts of

this case, in which the ALJ affirmatively found no severe mental impairment and no

corresponding mental functional limitations, the ALJ was not required to make an inquiry of the

VE regarding the mental demands of the claimant's past relevant work.  *See Wall v. Astrue*, 561

F.3d 1048, 1068-69 (10th Cir. 2009) (ALJ's analysis that the claimant could perform past

relevant work was adequate and remand would needlessly prolong proceedings); *Fischer-Ross v.*

*Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (ALJ's detailed findings at Step Four and Five

made remand for Step Three error unnecessary); *Qualls*, 428 Fed. Appx. at 850-51 (no error at

Step Four when the ALJ included no mental limitations in RFC determination).

The undersigned finds no error at Step Four of the ALJ's decision.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Sec'y. of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  "[C]ommon sense, not technical

perfection, is [the] guide" of a reviewing court.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167

(10th Cir. 2012).   In evaluating credibility, an ALJ must give specific reasons that are closely

linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social

Security Ruling ("SSR") 96-7p, 1996 WL 374186.  Some of the factors the ALJ may consider in

assessing the credibility of a claimant's complaints include "the levels of medication and their

effectiveness, the extensiveness of the attempts. . . to obtain relief, the frequency of medical

contacts, the nature of daily activities, subjective measures of credibility that are peculiarly

within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical

testimony with objective medical evidence."  *Kepler*, 68 F.3d at 391 (quotation and citation

16

omitted).

In his decision, the ALJ found that Suttles' "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[11]  (R. 19).  While the ALJ's credibility assessment was minimal, the Court finds it adequate.  *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole, the ALJ's findings regarding the claimant's testimony were "clear enough" without violating rule against *post hoc* justification).  Although the ALJ could have been more detailed in his credibility analysis, he did discuss the factors set forth in SSR 96-7p, including Suttles' activities of daily living, Suttles' description of the location, duration, and frequency of symptoms, and the conservative and routine medical treatment he had obtained for relief, including medication to alleviate symptoms.  (R. 18-20).  In making his credibility determination, the ALJ summarized Suttles's testimony, discussed the medical evidence, and gave specific reasons for finding Suttles not fully credible.  (R. 18-21).

The ALJ discussed Suttles' medical records, including the fact that on more than one occasion, Suttles had normal examinations and reported no problems to his providers, that records reflected his medications were working well and controlling his symptoms, and that there were minimal objective findings supporting Suttles' allegations.  (R. 19-21).  The ALJ's reliance upon the inconsistency between this medical evidence and Suttles' complaints is a specific

---

[11] Suttles faulted this language as meaningless boilerplate, but this sentence was merely a summary of the ALJ's analysis and was not harmful.  *See Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis") (quotation omitted).

reason for finding Suttles less than credible.  *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate

your statements in relation to the objective medical evidence").  A finding that the objective

medical evidence is inconsistent with the claimant's allegations of disabling pain is a legitimate

factor for an ALJ to consider in making a credibility assessment.  *Kepler*, 68 F.3d at 391

("consistency or compatibility of nonmedical testimony with objective medical evidence" is one

factor that an ALJ should consider in assessing credibility).  The ALJ did not rely solely on a lack

of corroborating objective medical evidence, but relied on other factors as well.  *See Kruse*, 436

Fed. Appx. at 886.

The ALJ also noted that no treating physician had found limitations greater than those

determined by the ALJ and that no treating physician had placed functional restrictions on

Genson that would interfere with his ability to work.  (R. 21).  The Tenth Circuit has affirmed

decisions in which credibility was based in part on the fact that no treating physician had placed

restrictions on the claimant.  *See, e.g., Boswell v. Astrue*, 450 Fed. Appx. 776, 778 (10th Cir.

2011) (unpublished); *Holden v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished).

Suttles made seven full pages of arguments attacking the ALJ's credibility assessment;

many of these arguments consisted of only one or two sentences, and/or have previously been

rejected by this Court and, in some instances, by the Tenth Circuit.  Plaintiff's Opening Brief,

Dkt. #16, pp. 3-10.  The Court is aware that counsel does not want to waive any issues by failing

to raise them, but such undeveloped arguments themselves may constitute a waiver.  *Wall*, 561

F.3d at 1066 (undeveloped or "perfunctory" arguments deprive the district court of the

opportunity to analyze and rule on the issue).

First, Suttles notes the ALJ's use of boilerplate language relating to "objective

18

verification" of Suttles' activities of daily living.  This Court has criticized this language and many other boilerplate provisions that are commonly used by ALJs.  *See Edwards v. Astrue*, 2012 WL 1115677 (N.D. Okla.); *Schieffer v. Astrue*, 2012 WL 1582032 (N.D. Okla.); *Snyder v. Astrue*, 2012 WL 2680856 (N.D. Okla.).  The Tenth Circuit has explained that boilerplate language is disfavored because it fails to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered."  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

While boilerplate language is disfavored, the boilerplate provisions that the ALJ included are not fatal to his credibility assessment because he performed an actual assessment of Suttles' credibility, linking substantial evidence to specific reasons.  *Hardman*, 362 F.3d at 678-81; *Kruse*, 2011 WL 3648131.  Further, the Tenth Circuit has rejected the argument made by Suttles that the "objective verification" language imposes "an incorrect standard of proof."  *Wall*, 561 F.3d at 1069-70 (language was "common sense observation" by ALJ rather than imposition of objective verifiability as standard).

Next, Suttles states that the ALJ was required to specify which portions of Suttles' testimony he considered true or untrue, citing *Hayden v. Barnhart,* 374 F.3d 986, 991 (10th Cir. 2004).  Plaintiff's Opening Brief, Dkt. #16, pp. 4-5.  However, as this Court explained in some detail in *Harper v. Astrue*, 2012 WL 2681292, at *9 (N.D. Okla. July 6, 2012), there is no such requirement, and *Hayden* actually appears to reject Suttles' argument.  The Tenth Circuit specifically rejected this argument in *Keyes-Zachary*, stating that it failed to demonstrate reversible error when the ALJ's discussion "performed the essential function of a credibility analysis by indicating to what extent he credited what [the claimant] said when determining the

limited effects of her symptoms." *Keyes-Zachary*, 695 F.3d at 1170.  Here, it is clear that the

ALJ credited many of Suttles' allegations, because he rejected the opinion of Dr. Fiegel that

Suttles could perform medium work.  (R. 20, 315-22).  The ALJ specifically found instead that

Suttles was limited to sedentary work in order to accommodate his pain.  (R. 18, 21).   Thus, this

is not a case where the ALJ completely rejected the claimant's allegations of pain, but instead the

ALJ here largely credited Suttles' claims.

Suttles goes on to complain of the ALJ's use of activities of daily living in his analysis,

making arguments that "minimal" activities of daily living do not support a finding that a

claimant can work on a full-time basis.  Plaintiff's Opening Brief, Dkt. #16, p. 6-7.  Here, as this

Court has summarized, the ALJ relied on several different legitimate legal reasons for finding

Suttles's claim of disability to be less than fully credible, and he linked those reasons to

substantial evidence.  It would be difficult to characterize the ALJ's analysis as relying

principally on "minimal" activities of daily living.  This Court rejects the argument that there was

any error in the ALJ's analysis relating to Suttles' activities of daily living, but even if there were

error, it would not be fatal to a credibility assessment that was thorough and relied on multiple

supported legitimate reasons.  *Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (in spite of a

legally flawed finding by ALJ, there was still substantial evidence supporting ALJ's ultimate

finding); *Tom v. Barnhart*, 147 Fed. Appx. 791, 793 (10th Cir. 2005) (unpublished) (ALJ's

improper questioning of treating physician's impartiality was not fatal to his discounting of

physician's opinion when he articulated other legitimate reasons).

Suttles lists several pieces of evidence that the ALJ "ignored."  A claimant made a similar

argument in a Tenth Circuit case, listing "certain pieces of favorable evidence."  *Stokes v. Astrue*,

274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished).  The Tenth Circuit said that the only

question it needed to consider was whether the ALJ's adverse credibility assessment "was closely

and affirmatively linked to evidence that a reasonable mind might accept as adequate to support

that conclusion." *Id.* at 686.  The Tenth Circuit found no reason to overturn the ALJ's credibility

determination. *Id.  See also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009)

(unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of

such quality as to require discussion).  This Court also finds that the ALJ's credibility assessment

was closely and affirmatively linked to evidence that supported the conclusion that Suttles was

not fully credible.

Suttles' multiple arguments regarding the ALJ's credibility assessment constitute "an

invitation to this court to engage in an impermissible reweighing of the evidence and to substitute

our judgment for that of the Commissioner," and the undersigned declines that invitation.

*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Miller ex rel. Thompson v.*

*Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's

view of evidence and relied on other evidence, but court declined to reweigh evidence).   All of

Suttles' arguments are essentially that Suttles would like for this Court to give more weight to the

evidence that is in his favor and less weight to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does
> not prevent an administrative agency's findings from being supported by
> substantial evidence.  We may not displace the agency's choice between two fairly
> conflicting views, even though the court would justifiably have made a different
> choice had the matter been before it *de novo*.

*Lax*, 489 F.3d at 1084 (citations, quotations, and brackets omitted).  The ALJ's credibility

determination was supported by specific reasons linked to substantial evidence, and the

undersigned therefore finds that it should be affirmed.  *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points).

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 4th day of March, 2013.

Paul J. Cleary
United States Magistrate Judge